**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

ALICIA CHARLIE, LEONA GARCIA LACY,
DARRELL TSOSIE, and E.H., a minor, by and
through his guardian, GARY HICKS on behalf
of themselves and a class of similarly situated
individuals,

        Plaintiffs,

        v.                              Civ. No. 21-652 SCY/KK

REHOBOTH MCKINLEY CHRISTIAN
HEALTH CARE SERVICES,

        Defendant.

**MEMORANDUM OPINION AND ORDER**
**GRANTING IN PART AND DENYING IN PART**
**MOTION FOR ATTORNEYS' FEES[1]**

      Plaintiffs and Defendant Rehoboth McKinley Christian Health Care Services reached a

class action settlement agreement related to a data breach that allegedly exposed patients' private

data to cybercriminals. Doc. 52. Simultaneously with the motion to approve the class settlement,

Plaintiffs filed their Motion For Attorneys' Fees, Expenses, And Service Awards And

Memorandum Of Law In Support Thereof. Doc. 47. The Court approved the class action

settlement, including appointment of class counsel and the payment of service awards to the

class representatives. Doc. 52 at 8. The Court, however, deferred ruling on class counsel's

application for expenses and attorneys' fees, which is the subject of the present Order. Docs. 47,

52. In their application, Plaintiffs seek payment for combined attorneys' fees and costs in the

---

[1] Pursuant to 28 U.S.C. § 636(c), the parties consented to the undersigned to conduct all
proceedings and to enter an order of judgment. Docs. 10, 11 & 12.

amount of $300,000. Pursuant to the terms of the class action settlement agreement, Defendant does not object to this request. Consistent with Tenth Circuit precedent, the Court considers whether it should use a percentage-of-fund or lodestar method of determining attorneys' fees. After concluding that lodestar is the appropriate method in this case, the Court concludes that $98,842 constitutes a reasonable fee, including costs.

## **BACKGROUND**

Plaintiffs filed this action in state court on June 4, 2021. Class Action Complaint, Doc. 2 ("Compl.") at 3. Defendant removed it to federal court on July 15, citing the Class Action Fairness Act. Doc. 1 at 3. The case concerns a cybersecurity incident through which an unauthorized actor was able to access patient information and data between January 21 and February 5, 2021. Compl. ¶ 41. Defendant learned of the breach on February 16 and began notifying affected individuals on May 19. *Id.* ¶¶ 39, 45. The complaint brings causes of action for (1) negligence; (2) intrusion upon seclusion/invasion of privacy; (3) negligence per se; (4) breach of implied contract; (5) breach of fiduciary duty; (6) unjust enrichment; (7) violation of the New Mexico Unfair Practices Act; and (8) violation of the Arizona Consumer Fraud Act.

Defendant filed a motion to dismiss all counts of the complaint on August 17, 2021. Doc. 15. The Court granted the motion in part and denied it in part, dismissing a portion of the complaint but allowing an amendment. Doc. 32. Plaintiffs did not file an amended complaint. The parties proceeded to engage in discovery and simultaneous settlement negotiations. Doc. 39 at 13.[2] After months of negotiations, the parties reached a settlement agreement to provide relief for a defined class in the form of: (1) reimbursement for lost time (up to four (4) hours at $15 per

---

[2] The native pagination in Doc. 39, and many other filings cited in this order, differs from the pagination in the CM/ECF header. The Court's citations are to the page numbers in the CM/ECF header at the top of the page, not the native pagination at the bottom.

hour) and ordinary out-of-pocket expenses up to $500; (2) reimbursement for extraordinary losses up to $3,500; (3) two years' free credit monitoring services; and (4) equitable relief in the form of security improvements to Defendant's systems. *Id.* at 14. The settlement agreement also provided for Service Awards to the named Plaintiffs in the amount of $2,500.00 per Plaintiff, and combined attorneys' fees, costs, and expenses in an amount not to exceed $300,000.00, subject to the approval of the Court. *Id.* at 19-20.

On October 25, 2022, Plaintiffs filed their Unopposed Motion for Preliminary Approval of Class Action Settlement. Doc. 39. The motion argued that the Court should certify the class for settlement purposes under Federal Rule of Civil Procedure 23. *Id.* at 21-26. The motion argued that the settlement was fair, reasonable, and adequate under Rule 23(e)(2). *Id.* at 26-34. The Court set a hearing on the motion. Doc. 41. In the notice of hearing, on the topic of attorneys' fees, the Court explained:

> The parties' settlement agreement stipulates that Plaintiffs' counsel may seek up to $300,000 in attorney's fees, which Plaintiffs represent constitutes 10% of the total benefit to the class. Doc. 39 at 29. At the hearing, the Court will discuss whether this calculation will need to be modified according to the actual rate of claims made after the claims deadline is closed. *Fager v. CenturyLink Commc'ns, LLC*, 854 F.3d 1167, 1177 (10th Cir. 2016) ("We see merit in an approach that ties attorney recovery to the amount actually paid to the class."). The Court will hear from the parties as to whether "the fee arrangement outlined in the settlement should be characterized as a constructive common fund or as a fee-shifting contract" and whether the Court should assess the reasonableness of the fee agreement through the percentage method, lodestar method, or hybrid method in which one method is cross-checked with the other. *See In re Home Depot Inc.*, 931 F.3d 1065, 1071 (11th Cir. 2019). The Court advises the parties that it is inclined to adopt a hybrid approach where it assesses the reasonableness of the attorney fees agreement using a percentage-of-fund approach that uses the amount actually paid to the class rather than a percentage of the theoretical maximum that could be paid to the class. The Court would then cross-check that amount with a lodestar calculation.
>
> The Court will also inquire as to whether the attorney's fees provision of the settlement agreement is a "clear sailing" agreement that requires heightened scrutiny from a district court. *Cf. In re Samsung Top-Load Washing Mach. Mktg., Sales Pracs. & Prod. Liab. Litig.*, 997 F.3d 1077, 1080 (10th Cir. 2021).

Doc. 41 at 11-12.

After the hearing, the Court preliminarily certified the class and directed class notice to issue. Doc. 45. Class notice reached 191,009 settlement class members, or 93.3% of the class. Doc. 48 at 2. Eleven class members sought to be excluded from the settlement, and none objected. *Id.* As of May 23, 2023—the day before the final approval hearing—the settlement administrator, Kroll Settlement Administration LLC, filed a declaration explaining:

> The claim form deadline was May 9, 2023. As of May 23, 2023, Kroll has received 334 timely paper claim forms received through the mail and 4,891 claim forms filed electronically through the Settlement Website, for a total of 5,225 timely claim forms. Kroll has also received five (5) late claim forms through the mail.
>
> Of the 5,225 timely claim forms received, 1,306 are determined to be valid. The remaining 3,919 claims were deemed invalid for one or more reasons, including but not limited to incomplete claim forms, failing to supply proper documentation, were not in the class list, and/or did not select attestation regarding time spent. The following is a summary of the 1,306 timely claim forms and the types of benefits claimed therein:
>
> *Lost-Time Reimbursement*: 1,028 claimants filed for lost-time reimbursement, for a total value of $45,765. As of May 23, 2023, Kroll has validated 1,007 of the claims for an aggregate value of $44,730.
>
> *Documented Ordinary Out-of-Pocket Expenses*: Seventy-six (76) claimants filed for expense reimbursement for a total value to $23,407.92. As of May 23, 2023, Kroll has validated four (4) of the expense reimbursement claims for a total value of $325.81.
>
> *Documented Out-of-Pocket Extraordinary Expenses*: Twenty-six (26) claimants filed for expense reimbursement for a total of $60,323.08. As of May 23, 2023, Kroll has validated one (1) of the expense reimbursement claims for a total value of $263.49.
>
> *Credit Monitoring Services*: 741 claimants filed for credit monitoring services, all of which have been determined to be valid by Kroll.

Doc. 50 at 5 ¶¶ 3-8.

At the final approval hearing, the Court expressed concern that, given the large number of invalidated claims forms, legitimate claims were being invalided for minor deficiencies. Class

counsel represented that this was not the issue. In fact, Kroll is reprocessing invalid claims with minor issues (e.g., leaving off an email from the claim form) and providing the class member the opportunity to cure the deficiency. Doc. 51 at 1 (clerk's minutes). Rather than being a result of minor deficiencies, most invalid claims are due to foreign hackers, who do not meet the class definition, filing claims. *Id*. More specifically, there are 218 claims by legitimate class members with deficiencies in the forms. This compares to 3700 claims that are suspected of being fraudulent; Kroll is still working through the issue. *Id.* At the hearing, the Court indicated it would grant final settlement approval and consider the issue of attorneys' fees separately. *Id.* at 2. On May 25, 2023, the Court granted the motion to approve the settlement and entered judgment as to all claims, save the request for attorneys' fees. Doc. 52.

## DISCUSSION

Plaintiffs assert that the "settlement benefit is conservatively valued at $2,379,083." Doc. 47 at 22. Plaintiffs note that their request of $300,000 in attorneys' fees is 12.6% of this amount, which they argue, "is well below the customary fee." *Id*. at 11. At least two assumptions on which Plaintiffs base their argument, however, fail to support Plaintiffs' request. First, as part of the total benefit to the class, Plaintiffs include benefits the class could have, but did not receive, as well as other difficult-to-quantify benefits. Second, Plaintiffs assume that the settlement is a common fund from which their attorneys should receive a percentage fee, rather than an hourly fee.

## I.     Benefit of settlement to the class

Attorneys' fees must be reasonable, regardless of whether the attorneys are paid by hour or percentage. *In re Syngenta AG MIR 162 Corn Litig.*, 61 F.4th 1126, 1193 (10th Cir. 2023) ("because the touchstone of a fee award analysis is reasonableness, we do not require rigid adherence to either the percentage-of-the-fund or lodestar methods in the common fund

context"). Further, regardless of how attorneys in a class action are paid, the reasonableness of their fees should be considered with reference to the overall settlement amount. *Fager v. CenturyLink Commc'ns, LLC*, 854 F.3d 1167, 1177 (10th Cir. 2016). Thus, before addressing whether Plaintiffs' attorneys should be paid by the hour or as a percentage of the settlement obtained, the Court first addresses Plaintiffs' contention that the settlement benefit to the class is at least $2,379,083. The Court finds that it is not.

The first category of benefits Plaintiffs identify is reimbursement for lost time and ordinary out-of-the-pocket expenses. Doc. 47 at 12. Plaintiffs assert, "If a modest 1% of the 191,009 Settlement Class Members make valid claims for [ordinary expense reimbursements and lost time] benefit, the potential value of this benefit is as high as $955,045." *Id.* at 22. Rather than arbitrarily speculating that 1% of the class members will make valid claims for these benefits, however, the Court looks to what class members *actually* claimed. *Sanchez v. Martinez*, 1982-NMCA-168, ¶¶ 19-20, 653 P.2d 897, 902-03 ("An award of damages predicated upon conjecture, guess, surmise or speculation is improper. A party seeking to recover damages has the burden of proving the existence of injuries and resulting damage with reasonable certainty."); *see also Fager*, 854 F.3d at 1177 (10th Cir. 2016) ("[w]e see merit in an approach that ties attorney recovery to the amount actually paid to the class" and favorably citing *Pearson v. NBTY, Inc.*, 772 F.3d 778 (7th Cir. 2014), which held that the class benefits do not include administrative costs); Barbara J. Rothstein & Thomas E. Willging, Managing Class Action Litigation: A Pocket Guide for Judges 33 (3d ed. 2010) ("Insist on actual information on claims filed to determine the benefit to class members and use that information both to place a value on the settlement and to award attorney fees."); *In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.*, 851 F. Supp. 2d 1040, 1075 (S.D. Tex. 2012) ("[T]he court should not base

the attorney fee award on the amount of money set aside to satisfy potential claims. Rather, the fee awards should be based only on the benefits actually delivered." (quoting Manual for Complex Litigation, Third § 21.71 (1995))). The claims administrator, Kroll, has not finished processing claims, but, as of May 24, 2023, it had validated $44,730 in claims for lost-time reimbursement and $325.81 in ordinary out-of-pocket expenses. Doc. 50 at 5-6.

Plaintiffs next argue that "Settlement Class Members are also eligible for up to $3,500.00 for reimbursement of extraordinary losses, a benefit that carries astronomical potential benefit with it." Doc. 47 at 22. Kroll, however, has only verified $263.49 in out-of-pocket extraordinary expenses. Thus, total lost time and out-of-pocket expense reimbursements add up to only $45,319.30 worth of monetary reimbursement claims—a number dwarfed by class counsel's request for $300,000.00 in fees.

Plaintiffs' third category of benefits relates to credit monitoring. They argue that "Settlement Class Members are eligible for two (2) years of free credit monitoring potentially valued as high as $915,926.35." Doc. 47 at 22. At least two problems exist with this assertion, however. First, this number is again predicated on an arbitrary assumption; namely, that "2% of the estimated 191,009 Settlement Class Members make claims for this benefit." Doc. 47 at 12-13. That is, Plaintiffs estimated that at least 3,820 class members would make a claim for free credit monitoring. In fact, however, only 741 claimants have made such a claim. Doc. 50 at 6. Thus, even valuing this benefit at $214.80 per claimant, as Plaintiffs do (Doc. 48 at 5), the actual received value of credit monitoring would be $159,166.80, not $915,926.35.

But the Court does not agree that with Plaintiffs that the retail value of the credit monitoring provided, rather than the actual cost of such credit monitoring, should be used to assess the value of credit monitoring. Plaintiffs' calculation of the value of credit monitoring is

based on their research, which shows "[t]he current least expensive credit monitoring services product available in the retail marketplace today costs approximately $8.95 per month" Doc. 48 at 5. This rate, however, does not represent a figure that anyone has paid, or necessarily would pay, in this case. Instead, although no party has informed the Court of the amount Defendant *actually* will pay for such credit monitoring, all parties agreed that the actual cost would be a fraction of the retail cost. Doc. 51 at 2 (clerk's minutes reflecting that class counsel estimated Defendant is probably paying less than $20 a person for two years of credit monitoring).

And, even the actual cost paid could overrepresent the value of credit monitoring to the class. That class members are willing to accept free credit monitoring does not mean those class members value such monitoring at either the retail rate or actual purchase rate. Because the lowest retail rate for credit monitoring on the market is a poor measure of the value of such credit monitoring to the class, because the Court has no information about the actual cost of such credit monitoring, and because New Mexico law prevents the Court from speculating about damages, the Court declines to quantify the value of credit monitoring to the class. *See In re Anthem, Inc. Data Breach Litig.*, No. 15-MD-02617-LHK, 2018 WL 3960068, at *7-8 (N.D. Cal. Aug. 17, 2018) (declining to quantify and add to the total settlement fund the benefits of credit monitoring and cybersecurity improvements to the defendant's systems).

Finally, Plaintiffs assert that "Settlement Class Members will benefit [from] the security-related measures implemented by RMCHCS." Doc. 47 at 23. They describe several security-enhancement measures Defendant took after this breach and represent that "Defendant's information security improvement have and will cost in excess of $1.7 million when all aspects are implemented." Doc. 48 at 6. Plaintiffs do not represent, however, that Defendant made these security improvements because of the lawsuit they filed. At the final approval hearing, the Court

observed that, regardless of whether Defendant was sued, this security breach alone might have motivated them to make these same security enhancements. In response, Plaintiffs' counsel candidly acknowledged as much. Nonetheless, Plaintiffs asserted that they worked with Defendant to ensure all appropriate enhancements were made and that they conducted an audit of these security measures. They then suggested that one-third of the $1.7 million should be considered to be Plaintiffs' contribution. Doc. 51 at 2. Plaintiffs, however, did not provide sufficiently detailed information about what exactly they did, or how much time they spent doing it, to allow the Court to assess a value to the assistance Plaintiffs provided. That is, Plaintiffs provide the Court with no way to measure the value of their assistance. Further, although this assistance might have provided a direct benefit to Defendant, it will not necessarily provide a benefit to class members who may or may not use Defendant's services in the future.

Looking at what measurable benefits the class actually received, the Court must reject Plaintiffs' evaluation that the value of this settlement to the class is at least $2,379,083. Indisputably, the amount actually paid to the class—$45,319.30—is a measurable benefit. The value of Kroll's services is also measurable. Doc. 48-1 at 7 ¶ 19 (Kroll declaration estimating $206,112 in total charges to administer the settlement). Arguably, these services should be counted as a benefit to the class. Adding Kroll's services to what was actually paid to the class yields a subtotal of $251,431.30. If the Court were to find that this case involved a common fund and that Plaintiffs' counsel should be paid a percentage of the common fund, Plaintiffs argue that counsel's services should be considered in calculating the total benefit to the class. Doc. 47 at 15. In a common-fund case, this argument has logical and legal support—in contingency fee cases, fees are typically taken as a percentage of the overall recovery. *See In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.*, 851 F. Supp. 2d at 1080 (including attorneys' fees

as part of value of settlement). But, "[w]hile . . . attorney's fees are generally included in the class benefit in common-fund cases, it does not make sense to do so in fee-shifting cases." *In re Home Depot Inc.*, 931 F.3d 1065, 1092 (11th Cir. 2019). Assuming, for the sake of argument, that Plaintiffs properly characterized this case as a common-fund case rather than a fee-shifting case, if Plaintiffs' counsel were to be paid one-third of the total settlement value, the total settlement value would be $377,146.95, of which class counsel's share would be $125,715.65.[3] *See In re Syngenta AG MIR 162 Corn Litig.*, 61 F.4th 1126, 1140 (10th Cir. 2023) (approving award of attorneys' fees of one-third of gross settlement amount).

## II.   Methods for determining reasonableness of attorneys' fees

The second foundational pillar on which Plaintiffs built their request for $300,000 in attorneys' fees is that the settlement in this case involves a common fund and so up to one-third of that fund should go toward attorneys' fees. Doc. 47 at 13. If Plaintiffs are correct that the settlement in this case involves a common fund, they have a strong argument that their attorneys should receive up to one-third of the total value of the settlement. If, however, this case is a fee-shifting case, a lodestar method of determining fees is typically most appropriate. As the Tenth Circuit recently recognized,

> [T]he "award of attorneys' fees is based on substantially different underlying purposes in a common fund case" than in other kinds of cases, *Brown* [*v. Phillips Petroleum Co.*], 838 F.2d [451,] 454 [(10th Cir. 1988)]—such as those involving fee-shifting statutes, *see Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 551 (2010) (explaining that the lodestar method accords with "the aim of fee-shifting statutes").

---

[3] Two-thirds of the settlement value would be the $251,431.30 and one-third of the settlement value would be one-half of that two-thirds, or $125,715.65. Adding these two figures together yields a total settlement value of $377,146.95.

*In re Syngenta AG MIR 162 Corn Litig.*, 61 F.4th 1126, 1191 (10th Cir. 2023). Because correctly characterizing the settlement is crucial to determining how attorneys' fees should be calculated, the Court considers the underlying rationale supporting the use of different methods for determining attorneys' fees and how the settlement in this case should be characterized.

"[T]here are two generally accepted means for awarding attorneys' fees in class action suits, the so-called lodestar method—determining fees based on the hours worked and a reasonable hourly fee—and the percentage-of-the-fund method—awarding fees based on a reasonable percentage of the overall award." *Ramah Navajo Chapter v. Babbitt*, 50 F. Supp. 2d 1091, 1095 (D.N.M. 1999); *see also Anchondo v. Anderson, Crenshaw & Assocs., L.L.C.*, 616 F.3d 1098, 1102 (10th Cir. 2010) (the lodestar method looks to the "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate" (citing *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983))). The lodestar "produces a presumptively reasonable fee that may in rare circumstances be adjusted to account for the presence of special circumstances." *Anchondo*, 616 F.3d at 1102.

If the settlement involves a common fund, class counsel's fees are typically determined through the percentage-of-the-fund method. *See Syngenta*, 61 F.4th at 1193 ("Faced with the question of whether the proper methodology for awarding attorneys' fees out of a common fund entailed a percentage-of-the-fund approach or a lodestar analysis, we expressed a preference for the percentage-of-the-fund approach where a special master made detailed factual findings in support of the approach." (internal quotation marks omitted)). Recognizing that "the touchstone of a fee award analysis is reasonableness," however, *Syngenta* noted that the Tenth Circuit does "not require rigid adherence to either the percentage-of-the-fund or lodestar methods in the common fund context." 61 F.4th at 1193. Thus, if the Court characterized this case as a common-

fund case, the Court would still have to consider whether, under the particular facts of this case, the percentage-of-the-fund or lodestar method would be most appropriate. The Court, however, need not engage in this analysis because it concludes that the settlement in this case does not involve a common fund. Instead, it contains a contractual-fee-shifting provision. The existence of that provision militates in favor of using the lodestar method.

Plaintiffs' argument that counsel should be paid a percentage of the fund of up to one-third of the settlement value (as long as that amount is within the $300,000 cap) is premised on their characterization of the present case as a common-fund case. Plaintiffs, however, provide no analysis to contend with the facts that this case involves no common fund and, as part of the settlement, the parties have agreed to shift the burden of Plaintiffs attorneys' fees to Defendant. As such, the facts of this case do not support Plaintiffs' justification for using a percentage-of-the-fund method of calculating attorneys' fees. As the Tenth Circuit recently explained in a common-fund case,

> In large class actions such as this, a relatively small handful of plaintiffs bear the cost of suit. If those plaintiffs prevail, their success benefits the entire class. Were the American Rule to apply in this context, the named class plaintiffs would shoulder the costs of suit—including attorneys' fees—for the entire class, even as the remainder of the class reaps the benefits of their labor. The common fund doctrine prevents such unjust enrichment by enabling class action attorneys to extract fees from the collective award, thereby spreading the costs of suit proportionately among the ascertainable class.

*Syngenta*, 61 F.4th at 1191-92 (internal quotation marks and citations omitted); *see also In re N.M. Indirect Purchasers Microsoft Corp.*, 2007-NMCA-007, ¶ 92, 140 N.M. 879, 910 ("A district court invokes the common fund doctrine in order to supervise the fund and to place the burden of class counsel's fees on the class.") (Sutin, J., concurring).

Where parties have contracted to have a defendant, not the named plaintiffs, shoulder the burden of attorneys' fees for the class, there is no fear that some class members will be unjustly

enriched by riding the coattails of the named plaintiffs; those named plaintiffs will carry no attorney fee burden at all. That is, there is no threat of unjust enrichment and, consequently, no need to use the percentage-of-the-fund method for determining attorneys' fees to avoid the unjust enrichment of certain class members. Here, by negotiating an attorneys' fee cap *after* negotiating a class settlement, and in agreeing that Defendant, not the class, would pay attorneys' fees, the parties explicitly relieved the class of the burden of paying class counsel's fees.

In addition, the percentage-of-the-fund method for determining attorneys' fees is premised on the existence of a fund from which a percentage can be taken. Here, no fund exists. Defendant's overall liability is determined by factors unknown at the time of settlement—how many class members make claims and exactly what claims those class members make (as opposed to the defendant creating a common fund to be divided among an undetermined number of class members). Granted, even when there is no common fund, it may sometimes still be appropriate to calculate attorneys' fees by first calculating the total value of the settlement to the class and then multiplying that number by a reasonable percentage for attorneys' fees. But this is different from a common-fund settlement where calculating attorneys' fees through the percentage-of-fund method is the presumption, rather than simply one option.

The Court's conclusion that the present case is not a common-fund case is supported by case law. Of particular significance is a 2019 Eleventh Circuit decision in a data breach case that analyzes when a settlement should be characterized as a common-fund settlement and when a settlement should be characterized as a fee-shifting contract. *In re Home Depot Inc.*, 931 F.3d 1065 (11th Cir. 2019). The *Home Depot* court concluded that the settlement at issue was best described as a contractual-fee-shifting settlement. *Id*. at 1079-82. Having so concluded, the court upheld the district court's use of the lodestar method, rather than the percentage-of-fund method

13

to determine attorneys' fees. *Id*. at 1079-82. The Court adopts the Eleventh Circuit's analysis and concludes that the settlement in the present case is also best described as a contractual-fee-shifting settlement. Like the district court in *Home Depot*, the Court also concludes that a lodestar is the most appropriate method of determining attorneys' fees.

*Home Depot* arose when the defendant, Home Depot, experienced a massive data breach that allowed hackers to "siphon off the personal financial information of customers." 931 F.3d at 1072. The class that sued Home Depot consisted of a variety of banks, credit unions, and financial institutions that issued cards that were placed at risk as a result of the breach. *Id*. at 1074-75. The Eleventh Circuit described the settlement reached as follows:

> In exchange for settling the case, Home Depot agreed to provide the following relief. First, Home Depot agreed to pay $25 million into a settlement fund. The fund would be used to pay any taxes due and to pay any service awards to class representatives that the District Court approved. The remainder of the fund would be distributed to class members who had not released their claims. No money in the fund would revert to Home Depot. Second, Home Depot agreed to pay up to $2.25 million to some of the smaller banks (the "independent sponsored entities"). To be eligible, these banks must certify that they did not have sufficient time or information to appropriately consider the release offers—i.e., that they were misled and/or coerced. Home Depot did not create a fund for these payments; if less than $2.25 million was claimed, Home Depot would pay only the amount claimed.

> Finally, Home Depot agreed to adopt security measures to protect its data. These measures include developing a "risk exception" process to identify risks in its data security; designing safeguards to manage any risks identified; monitoring its service providers and vendors to ensure compliance with those safeguards; and implementing an industry recognized security control framework.

> On the matter of attorney's fees, the settlement agreement provided that Home Depot would pay the "reasonable attorneys' fees, costs and expenses" of Class Counsel. But the agreement left the amount of fees undetermined. Pursuant to the agreement, Class Counsel would submit to the District Court a requested amount in fees and expenses, to which Home Depot was free to object. While each party reserved its right to appeal the District Court's decision on attorney's fees, the amount awarded—no matter how large or how small—would not affect the "finality or effectiveness" of the settlement. Notably, the agreement stated that Home Depot's payment of attorney's fees would be "separate from and in

14

> addition to" the settlement fund. In other words, payment would not come from the $25 million set aside for class members.
>
> The District Court approved the settlement agreement, noting that the issue of attorney's fees would be decided separately.

*Id*. at 1074 (footnotes omitted).

In deciding the award of attorneys' fees, the district court employed a lodestar method with a multiplier of 1.3, using a percentage method as a cross-check on the lodestar. *Id*. at 1076. Further, the district court declined to consider attorneys' fees as part of a class benefit because it did not consider the case "a true common fund analysis." *Id*. at 1077. Home Depot appealed, arguing that the district court abused its discretion in using a multiplier and in compensating class counsel for time spent on various tasks. *Id*. at 1077-78. In addressing this appeal, the Eleventh Circuit began with "the preliminary question on which much of the subsequent analysis turns: whether this is a common-fund or fee-shifting case." *Id*. at 1078. Like the Tenth Circuit in *Syngenta*, the Eleventh Circuit recognized that, in common-fund cases, "the attorney's fees come from the fund, which belongs to the class. In this way, the client, not the losing party, pays the attorney's fees." *Home Depot*, 931 F.3d at 1079. The court then observed that, "the key distinction between common-fund and fee-shifting cases is whether the attorney's fees are paid by the client (as in common-fund cases) or by the other party (as in fee-shifting cases)." *Id*. Because the settlement clearly provided that Home Depot would pay reasonable attorneys' fees, the Eleventh Circuit easily determined that the case was a fee-shifting case. *Id*. at 1079-80.

The Eleventh Circuit nonetheless also considered whether the case could be fairly categorized as a "constructive common fund" case. *Id.* at 1080. The court noted, "Where class action settlements are concerned, courts will often classify the fee arrangement as a 'constructive common fund' that is governed by common-fund principles even when the agreement states that fees will be paid separately." *Id*. "The rationale for the constructive common fund is that the

defendant negotiated the payment to the class and the payment to counsel as a 'package deal.'"
*Id.* Because a defendant is concerned first and foremost with liability, the rationale goes, "courts
have recognized that, as a practical matter, defendants undoubtedly take into account the amount
of attorney's fees when they agree on an amount to pay the class." *Id.* In *Home Depot*, the
Eleventh Circuit rejected the plaintiffs' constructive common-fund argument because, "Put
simply, there was no package: Home Depot did not negotiate the attorney's fees simultaneously
with the settlement fund." *Id*.

Similarly, as in *Home Depot*, there was no package deal here; the parties negotiated the
attorney fee cap *after* they reached a settlement for the class. Doc. 39-1 at 7, ¶ 7(a) ("The Class
Counsel Payment was negotiated after the primary terms of the settlement were negotiated.").
Rather than agreeing on a settlement fund, the parties agreed that Defendant would pay damages
to the class in certain categories (if claimed) as well as undetermined administrative costs and
undetermined attorneys' fees (capped at $300,000). And, if the Court awards Plaintiffs' counsel
less than the negotiated attorney-fee cap, Defendant retains the difference rather than that
difference reverting to a class common fund. Doc. 39-1 at 7 (unawarded attorneys' fees are
simply not paid by Defendant to anyone). These contractual provisions alone provide a
compelling reason to follow *Home Depot*'s lead and characterize this case as a contractual-fee-
shifting case rather than as a common-fund case.

But an even more compelling reason exists in this case to reject the characterization of
the case as a common-fund case: unlike in *Home Depot*, the settlement in the present case
provides for no common fund at all. Instead of setting aside a pool of money that the class
members can divide amongst themselves, the amount of money Defendant must pay out to the
class is dependent on the number and type of claims that are filed. Because the Court rejects the

premise of Plaintiffs' argument (i.e., this case is a common-fund case), it also rejects its conclusion (i.e., that the percentage-of-fund method should be used). *See Brown*, 838 F.2d at 454 ("Fees in common fund cases are extracted from the predetermined damage recovery rather than obtained from the losing party."). Because the parties in the present case contracted to shift fees, and because Defendant never set up a common fund, this case is better characterized as a "contractual-fee-shifting" case than a common-fund case. *See Home Depot*, 931 F.3d at 1082.

The cases Plaintiffs cite indicating a preference for a percentage-of-the-fund method for assessing attorneys' fees in common-fund cases are therefore inapplicable. Nonetheless, that does not end the Court's analysis. Although sound reasons exist to use a lodestar in contractual-fee-shifting cases like this one, the Court is unaware of any binding precedent that indicates the lodestar method must be used. *Cf. Home Depot*, 931 F.3d at 1081-82 (concluding that, within the Eleventh Circuit, although the Supreme Court has said that courts should use the lodestar method in statutory-fee-shifting cases, but in contractual fee-shifting cases the appropriate method "is not clearly governed by any binding precedent").

In advocating for the percentage-of-fund method, Plaintiffs point out widely recognized weaknesses in the lodestar method, such as incentivizing class counsel to "multiply filings and drag along proceedings to increase their lodestar." Doc. 47 at 13-14 (quoting *Ramah Navajo Chapter*, 167 F. Supp. 3d 1217, 1241-42 (D.N.M. 2016)). Although this risk exists and, as such, is a weakness of the lodestar method, it is a risk that exists whenever a lodestar is used, to include its use in statutory-fee-shifting cases. Nonetheless, "the Supreme Court has said that courts must use the lodestar method" in statutory-fee-shifting cases. *See Home Depot*, 931 F.3d at 1081 ("The 'lodestar' figure has, as its name suggests, become the guiding light of our fee-shifting jurisprudence." (quoting *City of Burlington v. Dague,* 505 U.S. 557, 562 (1992))).

Moreover, the risk that an attorney will multiply filings simply to increase their fee is also mitigated by procedural and ethical rules designed to prevent such conduct. Fed. R. Civ. P. 11(b)(1) ("By presenting to the court a pleading, written motion, or other paper . . . an attorney . . . certifies . . . it is not being presented for any improper purpose, such as to . . . needlessly increase the cost of litigation . . . ."); Rule 16-301 NMRA of the Rules of Professional Conduct ("A lawyer shall not . . . assert or controvert an issue . . . unless there is a basis in law and fact for doing so that is not frivolous . . . ."). And, to the extent an attorney engages in excessive billing, the Court, especially when applying "heightened scrutiny" to the attorneys' fee request, can reject excessive portions of the attorneys' fee application.

The theoretical possibility that an attorney might excessively bill is also not a concern in the present case, as Plaintiffs' counsel have been extremely efficient. Despite any financial incentive the attorneys might have had to multiply filings and drag along the proceedings, they did not do so. Thus, no actual concern exists that Plaintiffs' counsel billed excessive hours to drive up their fees.

Moreover, neither the lodestar nor percentage-of-fund method is perfect. The percentage-of-the-fund method also carries the risk that class attorneys will be excessively compensated. The potential for an oversized common-fund attorney fee award usually arises when an attorney obtains a large settlement compared to the number of hours the attorney has worked. For instance, an attorney who worked 2,000 hours en route to a $100 million dollar settlement would receive nearly $17,000/hour at a 33% contingency rate. Thus, in "mega" class actions, courts should "look at a percentage of recovery far less than the typical range and perhaps as low as 4%." Managing Class Action Litigation: A Pocket Guide for Judges, *supra*, at 36. That is, even

when using the percentage-of-the-fund method, courts should be cognizant of the resulting hourly rate.

In addition, in at least one published case, the Tenth Circuit has expressed a preference for using the lodestar method in a class action. In *Anchando v. Anderson, Crenshaw & Associates, L.L.C.*, the Tenth Circuit addressed an attorney fee dispute in a Fair Debt Collection Practices class action. 616 F.3d 1098, 1101 (10th Cir. 2010). The district court had awarded attorneys' fees using the lodestar method. The defendant appealed, in part, on grounds that the district court failed to explicitly address the "*Johnson* factors." *Id.* at 1103.[4] In rejecting the defendant's argument, the Tenth Circuit wrote:

> The Supreme Court's very recent decision in *Perdue* only confirms our reluctance to disturb a presumptively valid lodestar fee determination on the basis of a conclusory objection that *Johnson* factors were not discussed. In *Perdue* the Court appears to significantly marginalize the twelve-factor *Johnson* analysis, which it discounts as just "one possible method" that "gave very little actual guidance" and, due to its "series of sometimes subjective factors, produced disparate results." 130 S. Ct. at 1671-72 (quotation omitted). The *Perdue* Court clearly embraces the lodestar approach as the preferable alternative to the *Johnson* analysis, noting that the lodestar approach "achieved dominance in the federal courts after *Hensley*, *Gisbrecht v. Barnhart*, 535 U.S. 789, 801 (2002)," and has "become the guiding light of our fee-shifting jurisprudence." 130 S. Ct. at 1672 (also noting that "unlike the *Johnson* approach, the lodestar calculation is objective" and hence "produces reasonably predictable results") (quotations omitted). We do not suggest that the *Johnson* factors have become irrelevant; *Perdue* did not overrule *Hensley*'s allowance that under appropriate

---

[4] The *Johnson* factors are:

> (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill required to perform the service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorney; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*Anchondo*, 616 F.3d at 1103.

> circumstances they may be useful in determining subsequent ad hoc adjustments
> to the lodestar, *see Hensley*, 461 U.S. at 434 & n.9 (also noting, however, "that
> many of the *Johnson* factors usually are already subsumed within the initial
> calculation of hours reasonably expended at a reasonable hourly rate"). But, after
> *Perdue*, it has only become clearer that the lodestar determination is primary and
> that the propriety of such a determination is not automatically called into doubt
> merely because the trial court did not expressly discuss the *Johnson* factors.

*Anchondo*, 616 F.3d at 1103-04 (internal alterations and footnote omitted). Thus, the Court

rejects any contention that, in non-common-fund cases such as the present case, the Tenth Circuit

has expressed a preference for the percentage-of-fund approach.

In the present case, attorneys' fees and costs significantly exceed the amount of money

actually paid to the class. Actual money paid to the class amounts to approximately $45,000. In

comparison, the claims administrator estimates it will bill $206,112. Doc. 48-1 at 7 ¶ 19.

Granting Plaintiffs' request for $300,000 in attorneys' fees, combined with the nominal costs of

$897.75 that Plaintiffs' attorneys have incurred, would mean that the payout to the claims

administrator and Plaintiffs' attorneys would be over ten times greater than the payout to class

members. Such a discrepancy raises concerns regarding whether the settlement reached was in

the best interests of the class, as opposed to the best interests of the class attorneys and class

administrator. *Cf. In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 938 (9th Cir. 2011)

(reversing where the settlement provided for a small cy près award, no economic damages to the

class, and $800,000 in attorney's fees).

Here, the Court approved the settlement agreement despite its awareness that the actual

money being paid out to the class administrator and class attorneys would greatly exceed the

amount of money being paid out to the class. The Court found, in part, that the outcome of the

class claims at trial was not certain and expressed concern that class members may not be able to

establish *any* actionable damages under New Mexico law at trial. Doc. 41 at 4. Also, because

each individual class members' damages were very small, it would be inefficient for any class

member to pursue relief outside the context of this class action. That is, the small relief available to class members through this class action benefited them more than the alternative—no relief at all. The Court also recognized that the benefit the vast majority of class members who filed valid claims are receiving is credit monitoring. *Id.* Although the parties have not provided the Court sufficient information to quantify the value of that benefit to the class, in deciding whether to approve the settlement, the Court still recognizes this benefit has a place on the scale.

In assessing the reasonableness of fees awarded, the Court must compare the amount Plaintiffs request for their attorneys to what the class is receiving. *Cf. In re Samsung*, 997 F.3d at 1090 ("In *Fager* we suggested that where a settlement agreement contains a 'kicker' provision, use of only the traditional lodestar method to calculate the fees award may not adequately scrutinize the requested award, and therefore a district court should crosscheck its award against the amount paid by the defendants to the class members."). Actual money paid to class members is around $45,000. Further, even though no evidence exists that most class members would be willing to pay retail value for the free credit monitoring they are receiving, using Plaintiffs' figure and multiplying the 741 class members who elected to receive credit monitoring by the $214.80 retail value of such monitoring, the sum only amounts to $159,166.80. Adding this amount to the $45,000 actually being paid to the class is approximately $204,000—which is $96,000 *less* than the amount Plaintiffs are asking for in attorneys' fees.

In support of their request for $300,000 in fees, Plaintiffs point out that potential class members were informed that Plaintiffs' counsel would be seeking fees in the amount of $300,000, yet none objected. This, however, is not surprising. Again, no common fund exists in this case. Under the clear terms of the settlement agreement, if the Court awards less than $300,000 in attorneys' fees, the difference between $300,000 and the amount awarded does not

revert to the class. Therefore, a class member who mounts a successful challenge to the $300,000 requested stands to gain nothing. This lawsuit, in which most class members are receiving no money (and those few who are receiving money are receiving little money), is unlikely to be a significant event in the life of any class member who is not a named party.[5] It is unlikely that any of these individuals, who already have a minimal stake in this case and who will receive nothing in exchange for any time and expense they would incur challenging the requested attorneys' fees, would take the initiative to mount such a challenge even if they disagreed with the amount of requested attorneys' fees.

Because Defendant does not have the ability to object to the attorney fee application and because class members do not have the incentive to do so, it falls on the Court to scrutinize the application. In fact, the Tenth Circuit has held "that a district court must apply heightened scrutiny before approving a settlement that includes both a 'kicker' agreement and a 'clear-sailing' agreement." *In re Samsung Top-Load Washing Mach. Mktg., Sales Pracs. & Prod. Liab. Litig.*, 997 F.3d 1077, 1081 (10th Cir. 2021). Because the attorney fee agreement in this case has both "clear sailing" and "kicker" provisions, binding Tenth Circuit precedent thus requires the Court to view it with heightened scrutiny.

"A 'clear sailing' agreement is one where the defendant agrees not to object to an award of attorneys' fees specified in a settlement agreement." *In re Samsung*, 997 F.3d at 1088 (alterations and some internal quotation marks omitted). A "kicker" is an agreement that "allows all fees not awarded to class counsel to revert to defendants rather than be added to the cy pres fund or otherwise benefit the class." *Id.* (internal quotation marks and alterations omitted). Here,

---

[5] And, the named Plaintiffs, who relied on their attorneys to advocate for their Service Awards, and who stood to gain nothing by objecting to their attorneys' fee application, were unlikely to object to their attorneys' requested fees.

the parties' agreement has a "clear sailing" provision in that Defendant has agreed not to object to the amount of fees Plaintiffs' counsel is requesting (exactly the $300,000 cap), and their agreement has a "kicker" because any amount the Court awards under $300,000 reverts to Defendant, rather than the class. Doc. 39-1 at 7.

Courts must review these agreements with heightened scrutiny because what is in the best interests of a defendant and of a plaintiffs' attorney may not be in the best interests of the class. From a defendant's perspective, the total amount it must pay out typically is of greater concern than how the class and the class attorney divide up that amount. If the cheapest way a defendant can settle a case is to pay the class little but pay the class attorney handsomely, it is economically rational for the defendant to enter into such an agreement. Thus, a court cannot depend on a defendant to object to an unreasonably high fee for the class attorney. A defendant's incentive to agree to a deal that may not be in the best interests of the class only increases where the deal includes a "kicker", meaning that any unawarded attorneys' fees revert to the defendant rather than to the class. *See In re Samsung*, 997 F.3d at 1090-91 ("[T]he Ninth Circuit has recognized that where a settlement agreement contains a 'kicker' and a 'clear-sailing' agreement, 'the district court has a special obligation to assure itself that the fees awarded in the agreement were not unreasonably high for, if they were, the likelihood is that the defendant obtained an economically beneficial concession with regard to the merits provisions, in the form of lower monetary payments to class members or less injunctive relief for the class than could otherwise have been obtained.'" (alterations and some internal quotation marks omitted)).

Similarly, a class attorney has a personal financial incentive to accept a deal that pays the attorney well but that may not be in the best interests of the class. Although a plaintiffs' attorney has a duty to put the clients' interests first, in recognition of the potential financial conflict of

interest that may exist between a class action attorney and that attorney's clients, a court has a fiduciary duty to review with heightened scrutiny clear sailing agreements that have a kicker. *Id.* at 1091 ("Faced with a settlement containing a 'kicker' agreement and a 'clear-sailing' agreement, a district court must carefully consider whether the settlement was negotiated at arms-length. As part of this evaluation, the district court shall take special care to assure the class members receive fair and reasonable compensation based on record evidence of their actual damages and the likelihood of success at trial.").

Plaintiffs' counsel argues that no financial conflict of interest existed in the present case because Plaintiffs' counsel and Defendant's counsel negotiated the settlement agreement in two stages. They first reached a settlement on behalf of the class and, only after having reached such an agreement, did they negotiate an agreement on attorneys' fees. The Court agrees.[6] No evidence exists that class counsel and defendant colluded to expand attorneys' fees at the cost of class compensation. However, that the attorneys negotiated the attorneys' fee cap separately, that Defendant is paying those fees, and that any amount under the cap reverts to Defendant, brings us full circle. The settlement reached, and the way it was reached, is inconsistent with a common fund or constructive common fund. Consequently, it is not a case where the Tenth Circuit has expressed a preference for the percentage-of-fund approach.

To be sure, Plaintiffs' counsel provided excellent representation to the class and obtained a settlement in a difficult case that was in the best interests of the class. That so few class members took advantage of benefits available to them is not the fault of class counsel. Thus,

---

[6] As the Court explained more fully at the May 24, 2023 hearing, the way the parties negotiated their agreement and the benefits the class received in this difficult case for them convinces the Court that this agreement was fairly negotiated and that Plaintiffs' counsel at all times acted in the best interests of their clients.

despite the modest number of valid claims (for a modest amount of benefits), class counsel deserves a reasonable fee for their services. The Court concludes that this reasonable fee can be best calculated through a lodestar. The Court therefore turns to calculating an appropriate attorney fee through use of the lodestar method.

## III.   Lodestar fee request

A lodestar is the "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Anchondo v. Anderson, Crenshaw & Assocs., L.L.C.*, 616 F.3d 1098, 1102 (10th Cir. 2010) (citing *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983)). The lodestar "produces a presumptively reasonable fee that may in rare circumstances be adjusted to account for the presence of special circumstances." *Id.*

### A.   Hourly rate

"To determine what constitutes a reasonable rate, the district court considers the prevailing market rate in the relevant community." *Lippoldt v. Cole*, 468 F.3d 1204, 1224 (10th Cir. 2006) (internal quotation marks omitted). The Court must review "evidence of the prevailing market rate for similar services by lawyers of reasonably comparable skill, experience, and reputation in the relevant community." *Id*. at 1224-25. "The establishment of hourly rates in awarding attorneys' fees is within the discretion of the trial judge who is familiar with the case and the prevailing rates in the area." *Lucero v. City of Trinidad*, 815 F.2d 1384, 1385 (10th Cir. 1987); *Jane L. v. Bangerter*, 61 F.3d 1505, 1510 (10th Cir. 1995) ("The setting of a reasonable hourly rate is within the district court's discretion."). "[I]f the district court does not have before it adequate evidence of prevailing market rates may the court, in its discretion, use other relevant factors, including its own knowledge, to establish the rate." *Case v. Unified Sch. Dist. No. 233, Johnson Cnty., Kan.*, 157 F.3d 1243, 1257 (10th Cir. 1998).

Plaintiffs request hourly rates as follows:

| | |
|---|---|
| David K. Lietz (Partner) | $919 |
| Gary M. Klinger (Partner) | $850 |
| Lisa Barr (Associate) | $650 |
| Sandra Martin (Paralegal) | $208 |
| Tiffany Kuiper (Paralegal) | $208 |
| Taylor Heath (Paralegal) | $208 |

Doc. 47-1 at 6.

These rates are considerably higher than the prevailing market rates in New Mexico. Although Plaintiffs stress that they have been awarded these rates in other districts, *id.* at 5, the Tenth Circuit has instructed that the hourly rate is calculated for the relevant community "even when the lawyers seeking fees are from another area." *Ramos v. Lamm*, 713 F.2d 546, 555 (10th Cir. 1983), *disapproved of on other grounds by Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 483 U.S. 711, 718 n.4 (1987). The Tenth Circuit reasoned that, "[a]bsent more unusual circumstances than we see in this case," local communities have attorneys competent to handle civil rights litigation. *Id.* Similarly, it is this Court's experience that the New Mexico bar has attorneys capable of handling sophisticated class action litigation. Plaintiffs' counsel argued at the hearing that no local attorney specializes in data breach class action litigation. Doc. 51 at 3. But esoteric issues uniquely related to data breach cases were not litigated in this case; the issues contested primarily related to garden-variety concepts of New Mexico tort law such as duty, Doc. 32 at 8-14, and damages, *id.* at 14-16. New Mexico has an abundance of attorneys well versed in New Mexico tort law.

A review of hourly attorney fees allowed in New Mexico indicates that $400 an hour, even for the most experienced attorneys working on the most sophisticated cases, is at the high end, if not at the apex, of fees awarded. *E.g.*, *Rael v. Aldridge, Hammar & Wexler, P.A.*, No. 22cv446, 2023 WL 3648986, at *2 (D.N.M. May 25, 2023) ($300 per hour); *Salazar v. Green Square Co., LLC*, No. 21cv542, 2022 WL 1492577, at *11 (D.N.M. Mar. 16, 2022) ($295 per

hour), *report and recommendation adopted*, 2022 WL 1115271 (D.N.M. Apr. 14, 2022); *Bd. of Directors of Four Directions Park Condominiums Homeowners Ass'n, Inc. v. Casita De Las Flores, LLC*, No. A-1-CA-36435, 2020 WL 1815949, at *6 (N.M. Ct. App. Mar. 12, 2020) ($250 per hour); *Lucero v. Debt Recovery Attys.*, No. 19cv106 JAP/LF, 2020 WL 556898 (D.N.M. Feb. 3, 2020) ($292.08 per hour); *New Mexico Found. for Open Gov't v. Corizon Health*, 2020-NMCA-014, ¶ 28, 460 P.3d 43, 53 ($400 is "high end of the market range" but reasonable); *Vinyard v. New Mexico Hum. Servs. Dep't*, No. A-1-CA-36717, 2019 WL 6728859, at *9 (N.M. Ct. App. Nov. 12, 2019) ($160 per hour for time as a licensed lawyer and $100 for time as a paralegal); *XTO Energy, Inc. v. ATD, LLC*, No. 14cv1021, 2016 WL 1730171, at *32 (D.N.M. Apr. 1, 2016) ("[t]he Court has approved rates of $300.00 per hour and other judges in New Mexico have found rates of $350.00 per hour reasonable, but most rates in New Mexico are lower" and "a $400 rate would be close to the top, if not the top of the rates that the court has approved or seen in New Mexico").

After reviewing these cases, the Court will award $400 for partner work, $375 for local counsel work,[7] $275 an hour for associate work, and $150 an hour for paralegal work.

B.   Number of Hours

The Court agrees with Plaintiffs that the number of hours their counsel spent on this case was reasonable. The Court finds that counsel billed efficiently and recognizes that the lodestar method does not reward efficiency. Nonetheless, as discussed below, because the class monetary recovery is so low, the Court cannot justify an increase in fees using a method other than the lodestar.

---

[7] This is local counsel's billing rate according to her invoice.

27

C.      Expenses

The expenses requested in this case are very low, and the Court finds they are reasonable.

D.      Lodestar sum

These hours are taken from billing records class counsel submitted in camera, rather than from the declaration in support of the motion for attorneys' fees. These records are lodged with the Clerk of Court.

| Biller | Hours | Rate | Total |
|---|---|---|---|
| David Lietz (Milberg) | 93.6 | $400 | $37,440 |
| Lisa Barr (Milberg) | 69 | $275 | $18,975 |
| Tiffany Kuiper (Milberg) | 6.5 | $150 | $975 |
| Sandra Passanis (Milberg) | 2.8 | $150 | $420 |
| Ashley Tyrrell (Milberg) | 0.9 | $150 | $135 |
| Amanda K. Mkamanga (Milberg) | 0.1 | $150 | $15 |
| Taylor Heath (Mason Lietz and Klinger) | 6.77 | $150 | $1,016 |
| Gary Klinger (Mason Lietz and Klinger) | 17.75 | $400 | $7,100 |
| David Lietz (Mason Lietz and Klinger) | 54.1 | $400 | $21,640 |
| Sandra Martin (Mason Lietz and Klinger) | 11.5 | $150 | $1,725 |
| Kristina Martinez (Egolf Ferlic Martinez Harwood) | 10.6 | $375 | $3,975 |
| Mark Cox (Egolf Ferlic Martinez Harwood) | 0.9 | $275 | $248 |
| Devon Kovac (Egolf Ferlic Martinez Harwood) | 8.7 | $150 | $1,305 |
| Nicole McCauley (Egolf Ferlic Martinez Harwood) | 0.4 | $150 | $60 |
| David Lietz (Final Fairness Hearing) | 4.5 | $400 | $1,800 |
| Expenses (Milberg; Mason Lietz and Klinger) | | | $897.75 |
| Expenses (Egolf Ferlic Martinez Harwood) | | | $601.10 |
| NM Gross Receipts Tax (Egolf Ferlic Martinez Harwood) | | | $514.43 |
| **TOTAL** | | | **$98,842** |

E.      Lodestar adjustments

"A reasonable attorney's fee is one that is adequate to attract competent counsel, but that does not produce windfalls to attorneys." *Perdue*, 559 U.S. at 552 (internal alterations and quotation marks omitted). "[T]he lodestar method yields a fee that is presumptively sufficient to achieve this objective." *Id.* "There is a strong presumption that the lodestar figure is reasonable, but that presumption may be overcome in those rare circumstances in which the lodestar does not adequately take into account a factor that may properly be considered in determining a reasonable fee." *Id.* at 554 (internal alterations and quotation marks omitted). Factors such as the novelty and complexity of a case and quality of an attorney's performance are subsumed within the lodestar rate and thus should not serve as a basis for a multiplier. *Id.* at 553. An enhancement for taking a case on contingency is usually not appropriate in statutory-fee-shifting cases. Considering contingency risk implicates "the social cost of indiscriminately encouraging nonmeritorious claims to be brought." *City of Burlington v. Dague*, 505 U.S. 557, 563 (1992); *Home Depot*, 931 F.3d at 1084. This same rationale applies to contractual-fee-shifting cases.

In arguing that a lodestar multiplier is appropriate, Plaintiffs cite *Anderson Living Trust v. Energen Resources Corp.*, No. 13cv909, 2021 WL 3076910, at *8 (D.N.M. July 21, 2021). Doc. 47 at 23. This case is not on point, as it dealt with a percentage-of-the-fund method and used the lodestar and a multiplier merely to crosscheck the percentage method. The case also relied on *Samsung* to justify its multiplier, which likewise was a percentage-of-the-fund and lodestar-crosscheck case. 997 F.3d at 1094-95.

This contractual-fee-shifting settlement more closely resembles the contractual-fee-shifting settlement in *Home Depot*. As the Eleventh Circuit there recognized, contractual-fee-shifting cases resemble statutory-fee-shifting cases. 931 F.3d at 1081, 1085. And, in statutory-fee-shifting cases, the United States Supreme Court requires district courts to calculate attorneys'

29

fees using the lodestar method. *Id*. at 1082. Recognizing the similarity between contractual and statutory-fee-shifting cases, and recognizing the Supreme Court's criticism of lodestar multipliers in statutory-fee-shifting cases, the *Home Depot* court reversed the district court's use of a lodestar multiplier in the contractual-fee-shifting case before it. *Id.* at 1085-86.

Specifically, the Eleventh Circuit observed that the Supreme Court has noted in statutory-fee-shifting cases "that most of the factors used to justify an enhancement are already subsumed in the lodestar, so it would result in a windfall to count them again with a multiplier." *Id*. at 1085 (citing *Perdue*, 559 U.S. at 553). The Eleventh Circuit then concluded that the Supreme Court's reasoning (such as concerns that using a lodestar multiplier would incentivize meritless claims and make fees less predictable) applied equally to contractual-fee-shifting cases. *Id*. Therefore, it held, "Because it is inappropriate to enhance a lodestar in a fee-shifting case to account for risk, the District Court abused its discretion in applying a multiplier on the basis of the 'exceptional litigation risk that class counsel took in litigating this case.'" *Id*. at 1086. The same reasons that motivated the Eleventh Circuit to overturn the district court's use of a lodestar multiplier in *Home Depot* exist in the present case.

Moreover, to the extent the *Johnson* factors are relevant,[8] consideration of those factors do not favor Plaintiffs' request for attorneys' fees. Plaintiffs highlight the eighth *Johnson*

---

[8] The Tenth Circuit in *Anchando* and *Syngenta* indicated that the *Johnson* factors carry less weight in a lodestar analysis. In *Anchando*, the Tenth Circuit stated,

> In *Perdue* the Court appears to significantly marginalize the twelve-factor *Johnson* analysis, which it discounts as just "one possible method" that "gave very little actual guidance" and, due to its "series of sometimes subjective factors, produced disparate results." 130 S. Ct. at 1671-72 (quotation omitted). The *Perdue* Court clearly embraces the lodestar approach as the preferable alternative to the *Johnson* analysis, noting that the lodestar approach "achieved dominance in the federal courts after *Hensley*, *Gisbrecht v. Barnhart,* 535 U.S. 789, 801 (2002)," and has "become the guiding light of our fee-shifting jurisprudence." 130

factor—the amount involved and the results achieved. Doc. 47 at 19 ("under the *Johnson* factors, primary consideration is given to the results obtained" (citing *Brown v. Phillips Petroleum Co.*, 838 F.2d 451, 456 (10th Cir. 1988))). Using Plaintiffs' estimate of the value of the settlement in this case—$2,379,083—this eighth *Johnson* factor would weigh in Plaintiffs' favor. As set forth in the beginning of the Court's "Discussion" section of this Opinion, however, when considering what the class *actually* received as opposed to what the class *potentially* could have received, the results obtained are modest. Indeed, the fee award class counsel requests ($300,000) dwarfs the monetary relief for the class (approximately $45,000). Although the settlement provided for a significant potential benefit to the class, that potential was not realized. The fees awarded in this case reflect this reality; the results obtained do not provide a reason to adjust the lodestar rate. Nor do any of the other *Johnson* factors.

       1.    <u>The time and labor required</u>

Plaintiffs' counsel worked efficiently and was able to reach a settlement beneficial to the class without the need to expend hundreds of hours litigating the case. Although this is

---

S. Ct. at 1672 (also noting that "unlike the *Johnson* approach, the lodestar calculation is objective" and hence "produces reasonably predictable results") (quotations omitted).

616 F.3d at 1103 (alterations omitted). In *Syngenta*, the Tenth Circuit wrote, "we have acknowledged that the *Johnson* factors' applicability and weight in 'common fund situations will undoubtedly be different' than in statutory fee situations . . . ." *In re Syngenta*, 61 F.4th at 1193 (alterations omitted). Neither Tenth Circuit case, however, outright dismissed consideration of the *Johnson* factors in fee-shifting cases where a lodestar is used. *See Anchanto* ("We do not suggest that the *Johnson* factors have become irrelevant . . . under appropriate circumstances they may be useful in determining subsequent ad hoc adjustments to the lodestar." (citation omitted)); *In re Syngenta*, 61 F.4th at 1193 (in the common fund context, the court stated, "we further require district courts to consider the factors outlined in *Johnson* regardless of which method [lodestar or percentage-of-fund] is used" (citation omitted)).

commendable, the fees awarded are consistent with the relatively modest number of hours worked to obtain the present settlement.

### 2.   The novelty and difficulty of the questions

This case presented difficult questions of state law regarding duty and damages for which Plaintiffs' counsel is entitled to an hourly rate at the upper end of what attorneys in New Mexico with expertise litigating such issues receive. The case did not present novel issues related to class action law or data breach cases. Moreover, the explosion of data breach litigation in recent years has created an abundance of legal guidance and reduced the novelty of issues that arise in this area.

### 3.   The skill required to perform the service properly

Litigation of this case required a high degree of skill commensurate with the skill attorneys in New Mexico who are compensated at the higher end of the local pay scale. The attorneys' fees awarded reflect this reality.

### 4.   The preclusion of other employment by the attorney due to acceptance of the case

The Court has not been informed of any employment Plaintiffs' counsel was required to turn down to litigate this case and the relatively modest number of hours expended litigating this case makes it unlikely that Plaintiffs' counsel would have had to forego other employment to litigate this case.

### 5.   The customary fee

For the reasons stated above, the Court concludes that the lodestar is the customary method of determining fees in a contractual-fee-shifting case such as this. Plaintiffs' counsel is being compensated at the high end of the rate customarily paid in New Mexico.

6.     Whether the fee is fixed or contingent

For the reasons articulated above, awarding fees on an hourly basis, rather than on a contingency basis, is appropriate.

7.     Time limitations imposed by the client or the circumstances;

The Court is unaware of any time limitations.

8.     The amount involved and the results obtained

The Court discussed this factor above.

9.     The experience, reputation, and ability of the attorney

The experience, reputation and ability of Plaintiffs' attorneys is high and warrants paying these attorneys at the high end of the hourly rate skilled attorneys in New Mexico charge.

10.     The undesirability of the case

This case is similar to other data breach cases that appear to comprise the majority of Plaintiffs' counsel's practice. Although such cases present difficult causation, damages, and predominance issues, the Court does not view such cases as undesirable.

11.     The nature and length of the professional relationship with the client

The Court has no evidence that the nature and length of the professional relationship with the client in this case justifies payment at a rate higher than the upper-end of the rates which skilled attorneys in New Mexico charge clients with whom they have had long, complex relationships.

12.     Awards in similar cases

Many class actions, including data breach class actions, can be fairly characterized as common-fund cases. Because this case cannot be characterized as a common-fund case, comparison to those cases is less helpful. Instead, this is a contractual-fee-shifting case in which a lodestar is the most appropriate method of determining attorneys' fees. The attorneys' fees

awarded in this case are consistent with the upper end of what attorneys prosecuting similar cases in New Mexico charge.

## **CONCLUSION**

The Court grants the motion in part and awards $98,842 in attorneys' fees and costs to class counsel. A separate form of judgment will follow.


STEVEN C. YARBROUGH
UNITED STATES MAGISTRATE JUDGE